## HAYES v. WALDRON.

Whether the use of a stream to carry off the manufacturer's waste is reasonable or not, is a question of fact for the jury, depending upon the circumstances of the particular case, such as the size and character of the stream, and for what purposes it is used, the extent of the pollution, the benefit to the manufacturer, and the injury to the other riparian owners.

In determining the reasonableness of such use, evidence of usage in the deposit of similar waste is not admissible.

CASE by Simon F. Hayes against Jeremiah W. Waldron, for discharging saw-dust and shavings from the defendant's mill into the Cochecho river, which ran through the plaintiff's meadows below the mill, and was accustomed to overflow them in times of high water, whereby the saw-dust and shavings, in times of high water, were carried and deposited on these meadows. The defendant's saw-mill, situate on his land on the river, was a belt mill, driven by water, and prior to 1847 the saw-dust had been carried by a belt and box into the wheel pit, whence it passed off through the tail race into the river. About 1857 the belt and box were changed so as to carry the saw-dust directly into the river opposite and back of the mill, which is some twenty feet from the river. At the river bank there is a bank wall some six feet high from the water, and the belt and box are some twelve or fifteen feet above the water, and extend just beyond the wall, so as to drop the saw-dust into the bed of the river. About 1852 the defendant put in a planing machine, and the shavings from it were carried away and burnt till July 4, 1858, when the defendant put in a belt and box similar to the other, and discharged the shavings into the river some twelve or fifteen feet below where the saw-dust was discharged. If there had been no belts and boxes to carry off the saw-dust and shavings, they would have fallen into a room under the mill, and not into the water. In the winter the saw-dust and shavings accumulated where they fell into the river, and were from time to time shoveled into the river directly, or through holes cut in the ice, if frozen. The testimony was somewhat conflicting as to the extent of the accumulations and the frequency of the removals. As bearing on the question whether such discharge of saw-dust and shavings into the river was a reasonable use of the stream by the defendant, he offered to show a uniform, long continued, uninterrupted and undisputed usage for water saw-mills, planing machines and shingle and clapboard machines to discharge their saw-dust, chips and shavings into the stream; to which the plaintiff objected, but the court overruled the objection.

Then a considerable number of witnesses, acquainted with saw-mills, some with many, others with few, in that vicinity, and also in other parts of the State, testified that in all the water saw-mills they ever knew the saw-dust was discharged into the streams. All of the mills they had known, except a very few, were not belt-mills, but the saw-dust in them fell directly from the saws into the wheel-pits, and passed off through the tail races into the streams. Some of the witnesses had known a very few belt-mills like the defendant's. Some had known quite a number of clapboard and

shingle mills for long periods, and in all these the chips and refuse were discharged into the streams. Some had known a few water planing machines, and in these the shavings were discharged into the streams; except that one Walker testified that he "thought that the refuse shavings from Barker's planing machine at Rochester were carried away, but he did not know that they were not put into the river." The defendant, however, testified that he "thought the shavings from Barker's machine dropped into the water." These witnesses each stated the extent of his acquaintance with mills. Some had been acquainted with a considerable number of saw-mills and shingle and clapboard machines as long as forty or fifty years; and some had been engaged in milling; some were owners of lands on streams below such mills, and none had ever known any objection to be made by land owners to such discharges into the stream, or the right to make them to be in question; except one Palmer had known the right to discharge saw-dust from a saw-mill into a stream in Derry to be denied in two instances. In one a land owner below objected to the discharge, and the matter was referred; in the other the owners of a pond below this mill objected because the saw-dust was filling up their pond, but no suit was brought and no action was taken by them in the matter; also one Whitehouse, who formerly owned the defendant's mill, testified that one Peavey, a land owner below the mill, objected to the saw-dust going into the river while he owned the mill, but he asserted to Peavey that he had the right to discharge it into the river. This Palmer, who had worked much in saw-mills and some in the defendant's mill, testified for the plaintiff that at the defendant's mill the belt and box could have been extended across the river so as to deposit the saw-dust on land on the opposite side, and that it would not have cost over $50 so to have extended them; and that at a little more expense they could have been arranged so as to deposit the saw-dust in front of the mill, between it and the road; and so with regard to the shavings.

The plaintiff requested the court to instruct the jury that the defendant had no right to conduct his saw-dust and shavings into the river, if they did any injury to the plaintiff's lands below; also that he had no right to discharge them into the river unless such discharge was necessary to running the defendant's mill.

The court did not give these instructions, but instructed the jury upon these points as follows:

"That in general each proprietor of land through or over which a water-course flows, has an equal right to the use of the water flowing in its natural course, without diminution, obstruction or pollution; and no one proprietor has the right to use the water to the prejudice of another's right to enjoy it; for, the water-course being common to them all, there is an equality of right among the proprietors to the enjoyment of it, and no one can use the water flowing through his land to injure or annoy those above or below. Each may use the water as he pleases, so that his user is not inconsistent with the similar rights of the other proprietors. The effect of this equality of right, when practically applied, and of the mutual limitations of right among riparian proprietors, is to qualify somewhat

the general principle first stated in its practical application. While such is the general principle, in its practical application it is subject to some qualifications; else it might, if applied literally, in many cases prevent any beneficial enjoyment of the stream. For many and indeed most important purposes there can not be a beneficial enjoyment without some diminution, detention or alteration of the velocity or condition of the stream. A use that made absolutely no diminution or detention, and strictly and literally added no foreign matter to a water-course, can not often be found that would be valuable to any one. The general principle is then subject to this qualification; that each proprietor may use and apply the water, as it runs over his land, to domestic, agricultural or manufacturing purposes, provided he uses it in a reasonable manner, and so as to work no actual or material injury to the others; and by actual or material injury is here meant infringement of the rights of others. A use that essentially or perceptibly impairs the lawful use of the proprietor below, or his power to make such use, is unreasonable. The test is not whether it produces some inconvenience or detriment to him, but whether it impairs the full, reasonable enjoyment of the stream, that he is entitled to equally with the proprietor above. Because a party is put to some inconvenience, it does not necessarily follow that his right is infringed and he entitled to recover; but if his right is infringed at all, he is entitled to recover at all events; if there are no actual damages, then nominal. These mutual rights are therefore accommodated to each other by restricting each proprietor to a reasonable use of the water and stream, such as does not perceptibly and really interfere with the right of each of the other proprietors to the reasonable enjoyment of it. The discharge of matters into the stream is lawful where and only where it is a reasonable use of the stream, when considered in reference to the equal rights of the other proprietors. Was the discharge of saw-dust and shavings from the defendant's mill into the stream, as made, a reasonable use of this watercourse by the defendant upon his land, within the principle suggested? The question is not, did it work to the plaintiff some inconvenience, but did it infringe his right to a reasonable use of the stream, or injuriously affect his power to enjoy that right? A use, sensibly and positively injurious by diminishing the value of the common right of any proprietor, or by diminishing his power of enjoying a reasonable use of it, is not reasonable or lawful. In determining the reasonableness of the use, all the circumstances shown were to be considered; among which were the situation and circumstances of the lands adjoining this watercourse; the nature and importance of the use for which the right was claimed; how far the use, if important, could be had with practical benefit— could be of practical value without the right claimed; that is, the importance and necessity of the right claimed to milling; the extent of the detriment, inconvenience, or injury that such use would in fact inflict on the proprietor below, and also the mode and extent of the discharge made; these were to be considered, with all the other circumstances proved in the case. If they found a long, uniform and uninterrupted usage of saw-mills, and shingle, clapboard and plan-

ing mills to discharge their refuse into the streams, they would inquire whether the usage was essentially different from the defendant's practice. If not so different, they might consider such usage as competent evidence to be weighed with the other evidence upon the question of the reasonableness of the defendant's user. They were to enquire whether, under all the circumstances shown, and considering the equal rights of the other proprietors, the use made by the defendant of the stream on his land by discharging into it the saw-dust and shavings from his mill as he did, was a reasonable use within the meaning suggested; a use reasonably necessary and proper to his beneficial enjoyment of this stream, and consistent with the equal right of the plaintiff to a reasonable enjoyment of the stream; such a use as did not materially affect the plaintiff's power of lawful application of the water and the stream. If they found that the defendant made only a reasonable use of the water-course within the meaning suggested, he was entitled to a verdict; but if they found the use made by him was not such a reasonable use, the plaintiff was entitled to a verdict."

The jury having returned a verdict for the defendant, the plaintiff moved to set the same aside, because of these rulings and instructions of the court.

*Christie & Kingman*, for the plaitinff, cited *Tyler* v. *Wilkinson*, 4 Mason 397; Co. Litt. 200, b; 9 Co. 59; *Bealey* v. *Shaw*, 6 East 208; *Hill* v. *Mason*, 1 B. & A. 1; 1 B. & Ald. 1; 7 Man. 322; *Cashart* v. *Auburn*, 22 Barb. 497; Ang. on Watercourses 142–144; *Howell* v. *McCoy*, 3 Rawle 256; 3 Kent Com. 441; *Wood* v. *Ward*, 8 Exch. 748; *Embry* v. *Owen*, 4 E. L. & E. 466.

*Wheeler & Hall*, for the defendant, cited *Thompson* v. *Crocker*, 9 Pick. 59; *Newhall* v. *Ireson*, 8 Cush. 599; *Elliott* v. *Fitchburg R. R.*, 10 Cush 192; *Furber* v. *Martin*, 2 Gray 396; *Chandler* v. *Howland*, 7 Gray 350; *Gould* v. *Boston Duck Company*, 13 Gray 450; *Barrett* v. *Parsons*, 10 Cush. 371; *Snow* v. *Parsons*, 28 Vt. 459; *Wadsworth* v. *Tillotson*, 15 Conn. 366; *Merritt* v. *Brinkerhoff*, 17 Johns. 306; *Evans* v. *Merriweather*, 3 Scam. 496; *Sampson* v. *Hoddinot*, 87 E. C. L. 590; *Embrey* v. *Owen*, 6 Exch. 353; *Runnels* v. *Bullen*, 2 N. H. 537; *Snow* v. *Cowles*, 22 N. H. 301; *Cowles* v. *Kidder*, 24 N. H. 364; *Corlyen* v. *Lovering*, 1 Hurls. & Norm. 784.

BELLOWS, J. The charge was in substance that the defendant, being a riparian proprietor, was entitled to a reasonable use of the stream for manufacturing purposes; and whether it was a reasonable use to throw into the stream the saw-dust resulting from the process of manufacture, was a question of fact for the jury; and in determining that question the jury were required to keep in view that the plaintiff had a similar right to the reasonable use of the stream, which the defendant could not lawfully infringe; and they were further instructed that, in deciding whether the use by the defendant was reasonable, they were to take into consideration all the circumstances of the case, including the size and character of the

stream, the nature and importance of the use claimed and exercised by the defendant, together with the inconvenience or injury to the plaintiff.

To these instructions we think there can be no objection; on the contrary, they are sustained by the general current of authority upon that subject.

But the plaintiff urges that, in accordance with his request, the court should have charged the jury that the defendant had no right to conduct his saw-dust and shavings into the river, if they did *any* injury to the plaintiff's lands below, and also, that he had no right to discharge them into the river, unless such discharge was necessary to the running of his mill; and it appears that the court declined to charge the jury in these terms, but did instruct them that each proprietor might use and apply the water, as it runs over his land, to domestic, agricultural, or manufacturing purposes, provided he uses it in a reasonable manner, and so as to work no actual or material injury to the others; and by actual or material injury is meant infringement of the right of others; and again, that the test is, not whether it produces some inconvenience or detriment to him, but whether it impairs the full and reasonable enjoyment of the stream that he is entitled to equally with the proprietor above.

Of these instructions we think the plaintiff has no cause to complain; nor do we perceive any error in declining to give the instructions prayed for, in the terms suggested.

The instructions asked for were not correct without some qualifications; and, as we understand the charge, those qualifications were accurately stated.

The general principles that govern the use of running streams in respect to the abstraction, detention, or diversion of the water must also govern in respect to the deposit in the stream of waste matter and foreign substances resulting from the process of manufacture; namely, that a reasonable use may be made, and nothing more. What is such reasonable use in both cases is a question not of law, but of fact, depending upon the circumstances of each particular case. In respect to the former class of cases, it may be considered as well settled that in the use of a stream for domestic, agricultural and manufacturing purposes, to which every riparian owner is entitled, there may of right be some diminution, retardation, or acceleration of the natural current, that is perfectly consistent with the common right, and which is necessarily implied in the right to use it at all. *Tyler* v. *Wilkinson*, 4 Mason 397; 3 Kent Com. 572, and cases cited; *Embrey* v. *Owen*, 6 W. H. & G. 352. Such owner may even abstract and consume a portion of the water, for domestic purposes, for watering his cattle, and in some cases for irrigating his land, taking care not to interfere materially with a similar right in his neighbor. So, where the nature of the stream requires it, he may detain the water by his dam, to enable him to apply it usefully to manufacturing purposes, and then discharge it in the working of his mills, in quantities greater than the natural flow of the stream; but such use must be reasonable, and so as not to cause material injury or annoyance to his neighbor. What is a reasonable use must

depend upon a variety of conditions, such as the size and character of the stream, and the uses to which it can be or is applied; and, from the nature of the case, it is incapable of being defined to suit the vast variety of circumstances that exist; but the rule is flexible, and suited to the growing and changing wants of communities.

As it is in respect to the abstraction, detention, and diversion of the water, so it is and must be in respect to the deposit of waste, or other substances in the stream, as incidental to its use in the various modes before described. In many or most of these modes of use such deposits are to some extent necessarily made. In the construction and repair of mills and dams, in the excavations required for their foundations, and in the frequent removal of the gravel used for tightening such dams, the water must for a time, and necessarily, be rendered so impure as to cause inconvenience occasionally to persons engaged in a kind of manufacture requiring pure water. But if such building and repairs are reasonably conducted, the inconvenience must be borne just the same, and for the same reasons, as the inconvenience caused by the temporary and reasonable detention of the water while filling the dam. So in the use of a stream for purposes of agriculture, such as washing sheep, crossing it with teams, allowing cattle and swine to traverse it,—the same principles will apply. So in the use of many kinds of mills, such as saw-mills, fulling-mills, cotton and woolen factories,—there must be thrown into the stream more or less of the waste, such as saw-dust, soap-lees, and other impurities, and no ordinary care or prudence could prevent it. In the other cases such disposition of the whole waste, although not absolutely indispensable, would add greatly to the productive value of the mill power.

Whether, in either case, it may be rightfully done must depend upon the question whether, under all the circumstances of the case, it is or is not a reasonable use of the stream; and in determining that question the extent of the benefit to the mill owner, and of inconvenience or injury to others, may, as stated in the charge, very properly be considered. So in respect to the size and character of the stream, it being obvious that an amount of diminution or pollution which would be insignificant in a large stream, might, in a small one, be wholly destructive of the common right. So also, in determining the reasonableness of suffering the manufacturer's waste to pass off in the current, much must depend upon the use to which the stream below can be or is applied; whether as a mere highway alone, or for purposes of manufacture, requiring pure water, or for the supply of an aqueduct to a large city, as in the case of the Croton river; and in respect to the lands below adjacent to the river, the character of the banks, whether they are usually overflowed or not in high water, should be considered.

In accordance with these views, and directly in point, is the case of *Snow v. Parsons*, 28 Vt. 459, which was an action on the case for obstructing the plaintiff's water-wheel by means of the spent tan bark discharged into the stream at the defendant's tannery; and it was held that the reasonableness of such use and the extent of

inconvenience to which proprietors below must submit, was a question of fact for the jury.

The general views which we have stated are sustained by a great weight of authority, and among them, beside those already cited, are *Merritt* v. *Brinkerhoff*, 17 Johns. 306, which was elaborately discussed both at the bar and by the bench; and the court say (p. 320), that "the common use of the water of a stream by persons having mills above is frequently, if not generally, attended with damage and loss to the mills below; but that is incident to that common use, and for the most part unavoidable. If the injury is trivial, the law will not afford redress, because every person who builds a mill does it subject to this contingency." See also *Hetrich* v. *Deachler*, 6 Barr (Penn.) 32; *Pitts* v. *Lancaster Mills*, 13 Met. 156; *Blanchard* v. *Baker*, 8 Greenl. 245; *Arnold* v. *Foot*, 12 Wend. 330; *Sampson* v. *Hoddinnott*, 1 J. Scott N. S. Com. Bench 590; 87 Com. Law; Ang. on Water-courses, sec. 115, *et seq.*, and sec. 120, *et seq.*; 3 Kent Com. 446, and cases, and *Wason* v. *Sanborn*, Rockingham County, June, 1861.

But it is urged that the court should have charged the jury, as requested by the plaintiff, that the defendant "had no right to discharge his saw-dust and shavings into the river, unless such discharge was necessary to the running of his mills." The question, however, was not whether the acts complained of were necessary to the enjoyment of the defendant's right, in the sense that without them it could not be enjoyed at all, but whether such acts were done in the reasonable use of the stream; and of course in deciding that question the jury should consider the necessity or importance of the right claimed so to discharge the waste, as well as the extent of the injury likely to be caused to the plaintiff.

The plaintiff's counsel regards this discharge of the waste as an act by itself, distinct from the use of the mill, and likens it to the case of depositing the waste directly upon the plaintiff's land by means of teams or machinery provided for that purpose. To this view we are unable to assent, because the discharge of the waste into the stream, so far as it is reasonable, must be regarded as an incident of the right to use the stream for the manufacture which produces such waste, otherwise the act, if calculated to injure the proprietors below, could not be justified. In this respect it stands upon the same ground as the retardation or acceleration of the current in the proper and reasonable use of the mills.

Upon this point the court charged the jury to consider how far the use, if important, could be of practical value without the right claimed, and also the extent of the detriment, inconvenience, or injury to the owner below; and this we think goes as far as the plaintiff could rightfully ask.

The remaining question touches the admission of evidence of usage, as bearing upon the reasonableness of discharging the saw-dust and shavings into the stream. There are cases where the customs and usages of trade may be proved to aid in the construction of contracts, and in defining the obligations arising out of such trade. 1 Greenl. Ev., sec. 292; 2 Stark. Ev. 453, 456, and notes; *Dunham*

v. *Day*, 13 Johns. 40 ; *Cutter* v. *Powell*, 6 T. R. 320 ; *Noble* v. *Kenoway*, Doug. 510 ; *Dolby* v. *Hiest*, 1 B. & B. 224 ; *Renner* v. *Bank of Columbia*, 9 Wheat. 581.

But whether such customs and usages may or may not be proved to bear upon the question of reasonableness in a case not growing out of any contract, upon which we give no opinion, we are satisfied that the court erred in admitting the proof of usage in the case before us ; upon the ground that the jury may be presumed to be already sufficiently informed as to what is a reasonable use of a water-course, as they are supposed to be as to what shall constitute a reasonable state of repair of a highway ; *Hubbard* v. *Concord*, 35 N. H. 60 ; *Patterson* v. *Colebrook*, 29 N. H. 94 ; or what shall be considered a reasonable use of it by the traveller.

Our opinion therefore is that this does not belong to that class of cases concerning navigation, trade, or manufactures, about which the jury may be supposed to require the aid arising from the proof of customs or usages ; but we think the admission of such evidence would be to open an extensive field of enquiry in this and similar cases, upon the same principle, that would tend greatly to increase the expenses of litigation, without affording in general any substantial aid to the jury.

The direction to the jury upon this point appears to have been based upon the highly respectable authority of *Snow* v. *Parsons*, 28 Vt. 459 ; but upon a careful examination of the authorities we are unable to reconcile it with the course of our own courts upon that subject.

There must, therefore, be

*A new trial.*